O’Neall, J.
It appears from the proof, that Edmund Craddock, on the 11th of March, 1189, conveyed to James Taney, in trust for the children of the said Edmund, to wit, Mary, Anne, Edmund, Thomas, John and Judith, inter alia, two slaves, Reuben and Dave. Some time after the execution of this deed, the said Edmund died, and his widow Anne administered on his estate, and after some time intermarried with James Saxon ; the trustee James Yancy is dead, and his children are all either dead or removed from the State. The slaves remained in the possession of the widow Anne, from the death of the said Edmund until her marriage with the said James, and after her marriage they remained in the possession of herself and her husband, until the 4th of April, 1815, at which time James Saxon delivered them to the cestui que trusts, who suffered them still to remain in the possession of their mother (the defendant Anne). On the 1th day of August, 1815, the children of Edmund Craddock exchanged with William Clarke the man Dave, for a girl named *Sylvia and §15 in cash, and agreed that “thesaidnegro and money is to be put to the support of their said mother,” (the defendant Anne) “ during her life, ór more plainly speaking, the labor of said negro, and the use of the said money during her life.” On the 8th of January, 1818, James Saxon executed to the children of Edmund Craddock, a deed reciting the trust-deed executed by Edmund Craddock, and his delivery of the property described in it to the cestui que trusts on the 4th of April, 1815, and by it confirms and re-delivers the property to them. Reuben remained in possession of Saxon and wife until 1825, when Robert Creswell, Esq., bought him in the presence of Saxon and wife, from William Clarke, as agent for the children of Edmund Crad-dock, at the price of 400 or 450 dollars; this purchase of Reuben was for himself; he had previously paid in part of his price $190, which was laid out in the purchase of a boy Frank, who was conveyed in the first instance to Sarah E. Saxon, a daughter of the defendants; but on some dissatisfaction being expressed by the complainant, William Clarke, and some of the children of Edmund Craddock, the said Sarah conveyed the said boy Frank, to William Clarke, in trust for the sole and separate use of Nancy Saxon (the defendant Anne) during her life, and after her death for the use of her children by Edmund Craddock, deceased. After some time Frank was sold or exchanged for another man named Yirgil, and on Clarke complaining about it, it was agreed that Yirgil should stand in place of Frank, and Brandon, from whom he had been *53 bought, on the 10th of July, 1821, executed a bill of sale for him to the complainant, Clarke. On the 13th of January, 1825, William Moore conveyed to the complainant, Clarke, as trustee for the heirs of Edmund Craddock and Mrs. Anne Saxon, a negro girl named Sally; she was probably paid for out of the balance of the price of Reuben, for Mr. Creswell’s note, for it was presented to him by Moore, who sold and conveyed her, and he paid it to him. These negroes, to wit, Sylvia, Tirgil, and Sally, and their increase, are in the possession of the defendants, and are now claimed by James Saxon as his own ; but it is manifest from the proof, that this claim is a recent notion, most probably the effect of a loss of memory from old *age, and the consequent belief that whatever is in his possession is his own. The testimony of Major Dunlap and Mr, Creswell, most clearly show that to the original trust property and its substitute, the defendant James Saxon did not pretend to have any claim. His schedule in order to obtain a pension from the United States, was sworn to by him at Spring Term, 1822, and in it he does not pretend any claim to the slaves, the whole amount of the property embraced in it is about $1Y6. It is not pretended that any of these have been by him since acquired. The defendants were about removing from the State, and taking with them the said slaves. The complainant Clarke and his wife Judith, one of the children of Edmund Craddock, filed their bill to prevent the removal of the said slaves. To it, the defendant Anne pleaded coverture,, and the defendant James Saxon answered, alleging that Reuben and Dave were his own property, and that the other negroes substituted for them, he purchased with the proceeds of Reuben and Dave, and $200 of his own money.
The statement in the bill, under which this proof was given, after stating the execution of the trust-deed, is as follows, to wit: “ that the children, although all come of age long since, have not divided said property among them, but have consented to leave the same in the possession of their mother, Anne Saxon, during her life, formerly the wife of the said Edmund Craddock, now the wife of James Saxon. That, by virtue of a power given by the deed aforesaid, the property has been to some extent exchanged, and has also increased so that there are now, as your orator and oratrix believe, eight negroes subject to the said trust, a fellow, two wenehes and children, the names of some of whom are unknown to your orator and oratrix. ” The bill then charges that the said Anne Saxon and her husband, James Saxon, are about to remove from this State, and carry with them the aforesaid negroes, contrary to the wishes of the complainants.
This statement of the complainant’s title to the slaves, and of the character of the defendant’s possession, is certainly a very general and loose one; and had the proof been ’^objected to on the ground that it did not correspond with the allegations contained in the bill, it ought not to have been received, and the complainants must have amended their bill, and exhibited the papers on which they sought to recover. But from the report of the Chancellor, no such objection was made, and if parties go to trial on general statements contained in a bill or answer, and permit proof to be given, which ought to have been set out and exhibited, the Court is bound to decree on the ease thus made. It is true, pleadings, both at law and equity, are intended for the two *54 fold purpose of informing both the parties and the Court: the former as to the case to be made and answered by the proof; and the latter as to the case upon which judgment is to be rendered. So far as parties are concerned, the value of this rule is to prevent surprise. If a defendant permits evidence to be given under a general charge, without objecting to it, it is taken for granted that he is not surprised by it. To the Court, the only importance of the rule is, that enough should appear on the record to warrant the judgment which the facts proved, authorize the Court to pronounce. If the evidence given to the Court makes a case wholly foreign from that made by the bill and answer, then it follows that no decree can be pronounced upon it, and if it is the complainant’s proof, the bill must be dismissed. The inquiry in the case before us must be : first, is the case made by the proof, wholly foreign or different from that made by the bill, and resisted by the answer. The case as made by the bill, is that Edmund Craddock conveyed the slaves Reuben and Dave to James Yancy, in trust for the use of his children, that the cestui que trusts, instead of dividing the property and appropriating it to their own uses, suffered it to remain in the possession of their mother, Anne Saxon, during her life; that the property has been exchanged for other slaves, and now consists of a fellow, two wenches and children. The defendant, James Saxon, answers and claims not only the substituted slaves, but those conveyed by the trust-deed, as his own property, by virtue of a purchase made by him of them, at Sheriff’s sale in 1194 or ’95. He admits that the *slaves substituted for the trust slaves, were acquired by exchange, or by purchase, with the proceeds arising from a sale of them, except so far as $200 excess, which he alleges he paid. The proof given by the complainants certainly establishes the original trust, and that by the consent of the cestui que trusts, the original property has been exchanged for the slaves in the defendant’s possession, and that in the slaves Sylvia and her increase and Yirgil, a part of the property thus substituted, they have given the defendant, Mrs. Saxon, an estate for life; and so far, there is no discrepancy between the proof and the charge contained in the bill. In answer to the defendant’s claim of property, his deed surrendering all right to it, his schedule made out and sworn to, in order to obtain a pension, and his declarations to Maj. Dunlap and Mr. Ores well, disclaiming any interest, were plainly admissible. I am therefore satisfied, that notwithstanding the generality of the statement in the bill, the case must be decided on the proofs before the Court.
I think the Chancellor was mistaken in his conclusion, in supposing’ that to entitle the complainants to a decree, it was necessary that a case of trust created by contract, should be made out. As to the defendant, Mrs. Saxon, this could never have been done, for her coverture might have been a bar to any contract which she could have made. According to my view of the case, the defendants are trustees in legal contemplation, for the children of Edmund Craddock. They were certainly the owners of the slaves, Reuben and Dave, in August, 1815, when they exchanged Dave with Clarke for Sylvia, and agreed that her labor should be devoted to the use of Mrs. Saxon for life. She has been in her possession ever since, and when it is asked how she was entitled to hold her, the answer is plain — by the consent of her owners, she was entitled during her life to *55 the possession of the said slave. This made her tenant for life with reversion to the owners, her donors. From the proof, .Reuben was sold by Clarke, as the agent of the children of Edmund Craddock, and by the consent of Mr. and Mrs. Saxon, out of the proceeds of his sale, Frank and Sally were purchased. The first was originally *conveyed to a daughter of these defendants, Sarah E. Saxon, but she afterwards conveyed him to the complainant, Clarke, in trust for the sole and separate use of Mrs. Saxon, during life, and after her death, for the use of-the children of Edmund Craddock. He was afterwards sold or exchanged for Yirgil, and he was conveyed absolutely to Clarke. But a trust resulted from the fact that he was purchased with the trust fund. And Clarke held him subject to the trusts created by the deed of Sarah E. Saxon, conveying the boy Frank. Mrs. Saxon was, therefore, clearly entitled to a life estate in him, and her and her husband’s possession of him, must be referred to that title. The girl Sally was conveyed to Clarke, in trust, for the use of the children of Edmund Craddock and Mrs Saxon. Her possession of that slave (or if she was exchanged for another called Crees, as I suppose may be the case from the answer of James Saxon,) would be the possession of a tenant in common, of a chattel belonging to several. I have little doubt that it,was intended that she should have a life estate in this slave also ; but from the proof in the case, we should be bound to conclude, that her only interest was that of a tenancy in common with her children by Edmund Craddock. From the statement in the bill, an inference might be raised, that she had a life estate in this slave, as well as the interest in common, which the bill of sale from Moore to Clarke as trustée, gives her. From these views it is apparent, first, that James Saxon has no title to the said slaves ; secondly, that Mrs. Saxon is entitled to a separate estate for life in the slaves Sylvia and her increase and Yirgil — and that she has an undivided interest as tenant in common with the children of Edmund Craddock, in the slave Sail (or Crees) and her increase, and possibly a life estate in addition thereto. It is clear that her possession, and consequently the possession of her husband, must be referred to these titles. There can be no doubt after the case of Swann v. Ligón, that a tenant for life is a trustee for the remainder man, and the rule must be the same in favor of reversioners. So, too,-in equity, so far as the preservation of the whole property is concerned, a tenant in common is a trustee for Ms co-tenants ; for his possession is their possession.* In respect to her separate estate for life, and her interest in common, it was necessary that Mrs. Saxon should be a party; her coverture could not be pleaded either in bar of the trust resulting from the nature of her estate, nor could it be pleaded in abatement of the suit, because she was the party in interest. It is true, she could not by any act during coverture, create an express trust for the use of others, but there is no doubt she may acquire and receive an estate in either real or personal property, in fee or for life only. The legal consequences resulting from the estate do not depend on her consent, they arise by operation of law. The plea of coverture ought not, therefore, to have been sustained. Under the consent entered into on the trial, and reported by the Chancellor, the plea will be overruled, but she will be treated as if she had answered. I have already said that the possession of James Saxon must be referred to the title of his wife. She had a right to the *56 possession of Sylvia and her children and Virgil, for life ; and in Sally or Crees, she had a right in common, with the children of Edmund Crad-dock, and possibly also an estate for life. He had no right at all, but inasmuch as his wife, under her title, was entitled to the possession, he was also entitled to participate in the possession. His possession was in auter droit, and it follows, that he holds them subject to all the trusts to which his wife’s possession subjected her. His plea of the statute of limitations cannot therefore avail him. For in the slaves in which his wife had an estate, there can be no adverse holding by him, until the termination of her estate; so, too, as to the slave in which she has an interest in common, the statute cannot commence to run until an actual ouster.
It is admitted that the defendants intended to remove from the State, and take the said slaves with them. This is such an act as may endanger the ultimate rights of the complainants, and according to the well established principles of this Court, they are entitled to security from the defendants, not to remove the property out of the State.
It is therefore ordered and decreed : that the Chancellor’s decree be wholly reversed, and that the defendant James Saxon, (and if Anne Saxon should survive him, then that *she also,) enter into bond and security to the complainants, before the commissioners in double the value of the said slaves, that neither the said Janies Saxon and Anne his wife, or either of them, or any other person, by their, or either of their consent, shall remove or attempt to remove the said slaves, or any of them, from and beyond the limits of this State. The defendants must pay the costs.
Johnson, J., concurred.
Harper, J., absent.